DAYTON POWER AND LIGHT COMPANY, Complaint and
Appeal from Ordinance No. 19094, In re.
DAYTON POWER AND LIGHT COMPANY, Complaint and
Appeal from Ordinance No. 19093, In re.

Public Utilities Commission.

Nos. 27968, 27969.   Decided July 29, 1960.

*Mr. Herbert S. Beane* and *Mr. Robert J. White*, for the City of Dayton.

*Mr. J. R. Newlin*, *Mr. Julian deBruyn Kops*, *Mr. John Lansdale* and *Mr. Michael Scott* of *Squire, Sanders & Dempsey*, for the Dayton Power and Light Company.

*Mr. Mark McElroy*, attorney general, by *Messrs. Herbert T. Maher* and *Mr. Andrew R. Sarisky*, assistant attorneys general, *Mr. William B. Saxbe*, attorney general by *Mr. James F. DeLeone*, assistant attorney general, for the Public Utilities Commission of Ohio.

For further history see *Omnibus Index* in bound volume.

### FINDINGS AND ORDER

The Commission coming now to consider the above entitled Complaints and Appeals and the exhibits attached thereto and

made a part thereof, the testimony and exhibits adduced at public hearings held in these proceedings, and being otherwise fully advised in the premises and in compliance with the statutes provided, hereby renders its Findings and Order.

HISTORY OF THE PROCEEDINGS:

On August 7, 1958, the Dayton Power and Light Company, hereafter sometimes referred to as the Company, filed a Complaint and Appeal, being Docket No. 27,968 with this Commission pursuant to Section 4909.34, Revised Code, appealing from Ordinance No. 19094, passed by the Commission of the City of Dayton, Ohio, hereinafter sometimes referred to as the City, on July 7, 1958. On that same date, the Dayton Power and Light Company filed a separate Complaint and Appeal Docket No. 27,969 under the aforementioned statute appealing from Ordinance No. 19093, passed by the Commission of the City of Dayton, Ohio, on July 7, 1958. Various exhibits were filed with the Complaints and Appeals in support thereof. At the first public hearings held in these proceedings a Motion by the Company, concurred in by the City, was granted, consolidating the two cases.

At the time of the filing of the above Complaints and Appeals the Dayton Power and Light Company had on file with this Commission an Application for permission to increase its rates in the City of Dayton, being P. U. C. O. Docket No. 27,178, filed August 21, 1957. By virtue of the passing of the Ordinances, the Application Case No. 27,178 became moot and is not therefore now in issue.

On August 7, 1958, the Commission issued an Entry serving notice of the Complaints and Appeals in compliance with the provisions of Section 4909.34, Revised Code, as to notice, copies of which were duly served according to law. The Entry also assigned the matters for public hearing.

On September 5, 1958, the City of Dayton filed with the Commission three motions. The motions were (1) a Motion to Strike Company Exhibits No. 3, 3A, 4, and 5 from the record; (2) a Motion to Fix June 30, 1958, as the Date Certain for inventory and valuation purposes and the period either ending June 30, 1958, or that ending August 7, 1958, as the Test Period for accounting purposes; and (3) a Motion for Additional Time.

On September 10, 1958, an Entry was issued by the Com-

mission granting the City additional time to September 23, 1958.

On September 11, 1958, an Entry was issued by the Commission denying the Motion to Strike and the Motion to Fix a Date Certain. (Both of which were filed September 5, 1958.)

On September 19, 1958, the Company filed written testimony of the following witnesses: Edward J. Conner, Richard T. Stanze, Robert E. McCormick, Malcolm G. Davis, Charles H. Bartlett, and Henry Bader. Company Exhibit 4, Revised Statement of Operating Revenue was also filed on that date.

On September 23, 1958, the City filed objections to the inventory in accordance with Commission Rule 27.

Commencing on September 30, 1958, public hearings were had upon these proceedings which were continued from time to time until the case was submitted on February 15, 1960. The many days of hearings resulted in a record of approximately 7,000 pages. Fifteen witnesses testified in the course of the proceedings and 74 exhibits were introduced.

On June 12, 1959, at the close of the Company's direct case, the City moved that the case be dismissed in its entirety on the basis that the Commission had no jurisdiction as to Case No. 27,969 and that certain allocations were not made as to Case No. 27,968.

On June 22, 1959, the Commission overruled the Motion of the City as to dismissal and ordered the Company to submit certain allocations.

On December 28, 1959, the City filed a Writ of Prohibition with the Supreme Court of Ohio seeking to prohibit further consideration by this Commission of Case No. 27,969. Demurrers were filed by the Company and Counsel for the Commission.

On February 3, 1960, the Demurrers were sustained by the Supreme Court in *State, ex rel. City of Dayton* v. *Kenealy et al., Public Utilities Commission of Ohio, et al*, 170 Ohio St., 320.

On March 1, 1960, the Company filed its Brief with the Commission.

On March 31, 1960, the City filed its Brief.

On April 20, 1960, the Company filed a Brief in reply to that of the City.

COMMISSION DISCUSSION:

DATE CERTAIN:

The date certain utilized initially by Appellant in its exhibits was June 30, 1957, and a proposed allocated "Reproduction Cost New Less Depreciation" valuation for its property used and useful in rendering gas service in the City of Dayton as of June 30, 1957, was filed by Appellant with its Complaint and Appeal. *See* Company Exhibit No. 3. The Company also filed with its Complaint and Appeal Exhibit No. 3A which supplemented Exhibit No. 3 by bringing forward the valuation to December 31, 1957, together with Exhibit Nos. 4 and 5 which set forth respectively proposed accounting data for the twelve (12) months ending December 31, 1957, and testimony and data relating to cost of capital and fair rate of return as of December 31, 1957. *See* also Company Exhibit No. 4 (Revised), and 4A.

The Commission's Engineering Staff likewise prepared rate base valuations as of both June 30, 1957, and December 31, 1957. *See* Company Exhibits Nos. 45 and 46. The Accounting Staff of the Commission submitted exhibital data on revenues and expenses for the twelve (12) month period ending December 31, 1957 (Company Exhibit No. 47).

The City of Dayton filed a Motion to Strike aforecited Company Exhibits Nos. 3, 3A, 4 and 5 and a Motion to Fix the Date Certain and Test Period. One of the City's alleged grounds for its Motion to Strike was that the Commission had not fixed a date certain. In the latter Motion the City moved the Commission for an order fixing June 30, 1958, or in the alternative August 7, 1958, as the date certain for purposes of both the rate base valuation and the termination of the twelve (12) month period for the accounting data.

By an Entry issued September 10, 1958, the Commission overruled both Motions and reserved expressly the prerogative to request such aditional informational data as it might deem requisite in the premises. In discussion upon the record regarding the purport of said Entry, it was stated by the Commission that the date of December 31, 1957, utilized by the Company in its Exhibits, was being "accepted" by the Commission for purposes of the Company presenting its case and the initiation of the rate proceedings. However, it was pointed

out that a definite date certain was not fixed by the Commission; rather, the Commission would be guided by the evidence submitted to determine what date or dates should be utilized by the Commission to test the justness and reasonableness of the ordinance rates and, if necessary, to establish rates in lieu of the ordinance rates. The Commission reiterated that additional informational data would be requested of Appellant in the event such data was deemed necessary. R. 6-16.

The date certain utilized subsequently by the City and its witnesses in testimony and exhibits submitted as to rate of return and accounting data was September 30, 1959. *See* City Exhibits Nos. D and E. The City presented no direct testimony or other evidence relative to a proposed rate base valuation, it being contended by the City that the Commission is not required by law to either test or fix rates upon a reproduction cost new less depreciation rate base valuation in complaint and appeal proceedings from a municipal utility rate ordinance.

After a review of the record herein the Commission is of the opinion, and so finds, that the appropriate date certain in this proceeding for valuation purposes to test the justness and reasonableness of the ordinance rates in issue and to fix any other rates as may prove necessary, is the date of June 30, 1957, and that the twelve (12) months ended December 31, 1957, is proper for an accounting period to test and fix rates in conjunction with said mid-point date certain.

It appears to the Commission in this connection that utilization of a mid-point date certain for statutory rate base valuation purposes minimizes both the number and type of adjustments requisite in revenues and expenses which adjustments are necessarily based upon estimates and, thereby, minimizes to that extent the speculative and judgment factors inherent in utility rate-making.

Furthermore, it appears to the Commission that the operating and property valuation data encompassed within the calendar year 1957 reflects the operations of Appellant for a period in reasonable proximity to the date of July 7, 1958, when the ordinance or ordinances in issue were initially passed and to the period immediately preceding during which the City Commission was considering legislatively the enactment of said ordinance or ordinances. R. 6936—6939A.

Statutory Rate Base:

1. *Reproduction Cost New Valuation Estimates*

The Appellant utility's proposed estimate of the reproduction cost new less depreciation valuation of its property allocated to rendition of gas service to consumers within the City of Dayton as of June 30, 1957, was prepared for the most part under the direction of Appellant's primary engineering opinion witness, Charles H. Bartlett of Ford, Bacon and Davis, the Company's consulting engineering firm. *See* Company Exhibits Nos. 3, 3B, 3C, 6, 7, 7A, 8, 13, 14, 15, 16, 17, 18, 19, 20, 46, and R. 19-121, R. 147-291, R. 763-2317, and R. 6057-6333. *Cf.* Company Exhibit 3A.

A senior engineer of the consulting firm supervised directly and testified relative to the valuation of the Structures and Improvements, being Accounts Nos. 251-1, 251-2, 252, 253, 271-1 and 271-2. *See* Company Exhibits Nos. 21-33, 34-43, 48 and R. 2523 et seq., R. 2948 et seq., R. 3047 et seq., R. 3115 et seq., R. 3236 et seq., R. 4121 et seq., R. 4586 et seq., and R. 4623 et seq.

Appellant employed a realtor from Dayton who appraised and testified to the thirteen (13) parcels of land owned by the Company, said appraisal being predicated on the estimated fair market value thereof as of December 31, 1956, to which Mr. Bartlett applied a general overhead of 6.32 per cent. *See* Company Exhibit No. 44 and R. 383 et seq., R. 916-921, R. 3572-3615. The value of Rights-of-Way, Account 250-3, was estimated on the basis of acquisition price plus recording fees, labor costs and the addition of general overheads of 6.32 per cent by Engineer Bartlett. Inasmuch as book costs for rights-of-way acquired prior to 1943 were not available, the costs were estimated on the basis of each instrument recording the acquisition of such previously acquired parcels of rights-of-way. R. 376-83, R. 921-927, and R. 3615-39.

Six (6) property accounts covering office, stores, shop, laboratory, tools, work and other general equipment, and office furniture (Accounts Nos. 272, 274-277, and 279) were included in the inventory and appraisal at their undepreciated original or stated book cost. Said properties were allocated to the City of Dayton on a customer ratio. The sum of these plant accounts amounted to about 1.5 per cent of the aggregate valua-

tion estimate and none of said property was inspected. R. 809-14, R. 1754-59, R. 914-16, R. 1114-41, R. 1744-59.

The Company contended that its proposed "Inventory and Appraisal" accords generally with the methods of preparation and compilation utilized historically in regulatory jurisdictions employing valuation estimates of reproduction cost new (RCN) of utility plant in rate-making processes. The record manifests that the inventory was compiled from field inspections, largely comprising spot or purported sampling checks and, in part, from Company property records, work orders, maps, and previously developed inventories of the Company's property. Except as above indicated, it would appear the Company's appraisal estimates of physical property were developed for the most part by application of purportedly current unit costs and computed costs of installation on a contractual basis to the property listed in the inventory. The latter costs encompassed estimated current material prices, labor costs, and general direct and indirect overheads or costs.

An allocated valuation of the reproduction cost new of the Company's utility plant was prepared likewise by the Commission's Engineering Staff and offered in evidence by Appellant. *See* Company Exhibit No. 45. This appraisal estimate purports to reflect the current price levels of such property as of June 30, 1957, and was computed largely from application of trend factors to the book costs or surviving dollars of most of the Company's physical property accounts, as adjusted by the Commission's Staff both as to book cost of plant and allocation to use in the City of Dayton. R. 5215-22, R. 5398, R. 5414, R. 5038-88, R. 5120-44, R. 5459-62, R. 5880-81, R. 5259-63, R. 5370-98, R. 5448 et seq., R. 3739-45.

The Commission's staff engineer, under whose direction the appraisal was prepared, testified that the trend factors utilized were derived from the published composite indices of the Handy-Whitman Index, Public Utility Construction Costs, Bulletin No. 67 (North Central Division). R. 5169-5196. *Cf,* R. 5107-12. He stated that retirements are accounted for by the Company at actual construction costs or as reflected in blanket work orders at an average unit cost on a "first-in, first-out" (FIFO) basis. Retirement effected since 1925 are subject to verification against the Company's work orders. R. 5038-88, R. 5120-44, R. 5459-62, R. 5880-81,

The staff engineer used the land appraisals submitted by the Company in most instances. Adjustments were made in the trending factors and the application thereof relative to the various equipment, railroad siding and small land parcels accounts, as well as to some of the structures and improvements. R. 5145-49, R. 5542-97, R. 5225-59, R. 5621 et seq., R. 5881 et seq.

## 2. *Statutory Depreciation Estimates*

Field studies of depreciation of the utility plant were made by both the Company's consulting engineering firm and the Commission's staff engineers. In the major dollarwise accounts of Mains and Services, 224 inspections of mains and 135 inspections of services were made in the field to develop estimates of existing depreciation. Some properties, such as meters and certain equipment property, were not viewed physically but were subject to depreciation estimates alleged to be predicated upon engineering judgment.

Estimates of depreciation inherent in mains and services, were not developed in precisely the same manner by the Company and Commission staff engineers, although both gave consideration to depth and number of pits viewed in the mains and services which were uncovered for inspection. R. 3746-51, R. 5804 et seq. Adjustments were made by the staff engineer in these accounts to reflect the condition of the coating on more recently installed mains, the number of undersized services, and other considerations. R. 5813 et seq. Some plant accounts were depreciated by both the Company and staff engineers on the basis of alleged engineering experience and resulting judgment rather than by field studies. These accounts included meters, house regulators, equipment, etc. R. 5695 et seq.

The City contends that under Ohio public utility law there must be an "observed" study of all property subject to depreciation estimates. There would appear, however, to be no statutory requirement that depreciation be determined by visualizing the utility's physical property. Section 4909.05, Revised Code, refers to the depreciation "existing" in the property, which depreciation may be determined in any number of ways as has been held heretofore and followed by this Commission. *See* Commission Orders in Matter of the Application of the Columbus and Southern Ohio Electric Company, P. U. C. O.

Cases Nos. 28-192 and 28,338, and in Matter of the Application of the Cincinnati Gas & Electric Company, P. U. C. O. Case No. 27,749. Certainly some factors of depreciation, such as age and obsolescence, may be estimated without visualizing the property in issue. Further, it appears manifest that whether or not observation of property is required or the amount of property, if any, necessary to be observed for purposes of ascertaining statutory depreciation goes to the weight to be accorded the estimates of such depreciation in the absence of any statutory or other prescriptions therefor.

3. *Summary of Reproduction Cost New Less Depreciation Estimates.*

The respective estimates of an allocated valuation of reproduction cost new less depreciation as of June 30, 1957, prepared by the engineering consultants of the Company and by the Commission Staff may be summarized as follows:

Company:

| | |
|---|---|
| Reproduction Cost New | $28,225,181 |
| *Less*: Depreciation (19.77%) | 5,578,900 |
| Reproduction Cost New Less Depreciation | $22,646,281 |

Staff

| | |
|---|---|
| Reproduction Cost New | $26,794,169 |
| *Less*: Depreciation (19.39%) | 5,195,214 |
| Reproduction Cost New Less Depreciation | $21,598,955 |

Upon consideration of the facts of record in this proceeding, together with the specific matters outlined above, the Commission is of the opinion and so finds that the allocated estimate of $21,598,955 represents a closer approximation of the reproduction cost new less depreciation valuation of Appellant's plant and property within the City of Dayton as of June 30, 1957, and appears to be an appropriate valuation for use by the Commission in testing rates in this proceeding.

4. *Applicability of Section 4909.05, Revised Code.*

The City in its Brief and in argument before the Com-

mission asserted the proposition that the State Legislature had not provided statutorily a particular formula to guide the Commission in deciding the question of the justness and reasonableness of an ordinance rate. In fact, the City argues that, if the Commission finds an ordinance rate to be unjust and unreasonable, the Commission in fixing new rates which are just and reasonable is, as Counsel for the City avers, ''. . . at liberty under the Ohio law to arrive at valuation findings on the basis of any method it chooses.'' (Brief of the City of Dayton, p. 14.)

It is true, of course, that a municipal rate-fixing authority is not bound by any particular statutory formula in the establishment of rates. The statutes granting the power of rate fixing to municipalities do not contain any express legislative guidepost.

The argument of the City is based on an interpretation of Section 4909.40, Revised Code, which provides as follows:

''Chapters 4901., 4903., 4905., 4907., 4909., 4921., 4923., and 4925., Revised Code, do not apply to any rate, fare, or regulation prescribed by any municipal corporation granting a right, permission, authority, or franchise to use its streets, alleys, avenues, or public places for street railway purposes, or to any prices so fixed under Section 715.34, 743.26, and 743.28, Revised Code, except as provided in Sections 4909.34, 4909.35, 4909.36, 4909.38, and 4909.39, Revised Code.''

The City's contention is that the Commission's delegated authority is limited by this statute to Sections 4909.34, 4909.35, 4909.36, 4909.37, 4909.38 and 4909.39, exclusively, Revised Code, in an appeal from an Ordinance rate. It is argued that since the Commission is limited to these sections exclusively, Section 4909.05, Revised Code, setting forth the formula for rate base valuation is not applicable and the Commission is free to follow any formula it chooses in fixing valuation as long as that formula is consistent with the rather general standards set forth in Section 4909.39, Revised Code.

It is the opinion of the Commission that aforecited Section 4909.40, Revised Code, limits the scope of the Commission's jurisdiction in matters involving rates and prices fixed by municipal corporations pursuant to Sections 715.34, 743.26 and 743.28, Revised Code, to those cases in which an appeal is sought under Section 4909.34, Revised Code, and to cases where

the ordinance has expired. It does *not* modify or expand the delegated rate-fixing authority of the Commission once its jurisdiction is invoked.

This would appear to be the plain meaning of the language of the statute and the purport of the opinion of the Supreme Court of Ohio in *City of Cincinnati* v. *Public Utilities Commission*, 149 Ohio St., 570 (1948). Furthermore, in many cases of appeals from ordinance rates considered by the Supreme Court of Ohio, the decisions contain the implicit assumption that the standards set forth in Section 4909.05, Revised Code, apply to such cases. See *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio*, 171 Ohio St., 10 (1960).

Moreover, to hold that where the Commission's jurisdiction has been properly invoked by an appeal under said Section 4909.34, Revised Code, the powers and duties of the Commission are contained exclusively in these few sections set forth in Section 4909.40, Revised Code, and that the excluded chapters set forth therein have no application to such cases, leads to seemingly inconsistent and absurd results.

The City's position would give rise to two different sets of standards for fixing just and reasonable rates applicable to the same utility in different locations: the standards set forth in Section 4909.05, Revised Code, to areas outside of municipal corporation and an entirely different standard to the same utility within a municipality. The same inconsistency would follow as to the same utility within a municipality depending on whether the Commission's jurisdiction was invoked by application or appeal. It is doubtful if this double standard was intended by the Legislature.

The Commission has considered this proposition in other cases. See *Cleveland Electric Illuminating*, P. U. C. O. Case No. 12,604 (Jan. 24, 1947), 7 PUR (N. S.), 65; 1947 P. U. C. O. Reports, 13; and, *Complaint and Appeal of East Ohio Gas Company*, P. U. C. O. Cases Nos. 11,001, 11,218 and 11,442, 1944 P. U. C. O. Reports, 83. In the latter *East Ohio Gas Case*, the Commission stated in its Order:

"We believe that the interpretation placed upon the statutes of Ohio by the Supreme Court of this State have confined us in the determination of fair and reasonable rates of a gas utility to the use of the valuation procedure as set forth in the

statutes whether it be the initial determination of the reasonableness of a rate ordinance or in the determination of a substitute rate." p. 86.

The Commission concludes and is of the opinion that this statement constitutes the law to be applied to the instant case.

5. *Working Capital.*

The Company's proposed allowance for working capital allocable to gas service within the City of Dayton may be summarized as follows:

| | |
|---|---|
| Materials and Supplies | $384,244 |
| Cash Working Capital | 535,178 |
| Total Working Capital | $919,422 |

The Cash Working Capital element in the above computation is based upon 1/8th of operating expenses and 1/24th of purchased gas cost. Thus, any modifications of allowable operating expenses or purchased gas cost will result in a modification of allowable Cash Working Capital.

A deduction for Federal Income Tax accruals of $681,132 is then made by the Company from the Cash Working Capital which is more than sufficient to eliminate this item. *See* Company Exhibit No. 4, Revised, Schedule D. However, the $681,132 deduction is based upon the income tax pro-formed at the increased rates proposed by the Company. That is, Federal Income taxes, among other taxes, are a function of allowable revenues which are, in turn, a function of the rate base. It follows that a simultaneous determination is required. This procedure produces the following adjusted results:

| | |
|---|---|
| Materials and Supplies | $384,244 |
| Cash Working Capital | 526,430 |
| Total | $910,674 |
| Less: Tax Accruals | 608,649 |
| Net Working Capital | $302,025 |

The Commission is of the opinion and so finds that $302,025 represents a reasonable estimate of allowable net working capital for the purposes of this proceeding.

6. *Summary of Statutory Rate Base Valuation*

The rate base valuation of the Appellant is the sum of the reproduction cost new less depreciation of $21,598,955, plus allowable net working capital of $302,025, for a total statutory rate base of $21,900,980. The Commission is of the opinion, and so finds, that this sum of $21,900,980 constitutes a reasonable estimate of the total statutory rate base valuation for the purposes of this proceeding.

RATE OF RETURN

The Appellant's rate of return witness in this proceeding estimated that the fair rate of return should be between 6.3% and 6.55%. This is made up of two elements: (1) an estimated cost of capital of 6.05%, and (2) a judgment allowance of .25% to .50%. The estimated cost of capital was determined by this witness by combining estimated bond, preferred stock and common equity rates on the basis of a "typical" or "optimum" capitalization as follows:

| Type of Capital | Percent of total Capitalization | Recommended Rate | Composite Rate |
|---|---|---|---|
| Debt | 50% | 4.45% | 2.23% |
| Preferred Stock | 15 | 5.63 | .84 |
| Common Equity | 35 | 8.49 | 2.97 |
| Total | 100% | | 6.04% |

The recommended additional allowance of .25% to .50% is based upon what the witness calls "pragmatic judgment" (R. 2425) and although he was unable to explain any further how he arrived at these particular estimates, their purpose seems to be to compensate for "capital erosion" and "regulatory lag." Inflation that has in fact taken place is, of course, reflected in the RCNLD rate base valuation. To the extent that there is some regulatory lag in all rate proceedings and

to the extent that some capital erosion may occur due to prospective inflationary conditions, it must be presumed that these are partly, fully or excessively discounted by investors in setting the very market prices of securities that the witness uses in his capital cost computations. Since the witness has presented no evidence on the extent to which they are so discounted by investors, his recommendation of an allowance in excess of cost of capital must be rejected.

The recommended rates on debt and preferred stock in this computation do not represent the actual current rates being paid by this Company on or about the date certain. rather, the 4.45% on debt and 5.63% on preferred stock represent the witness's estimate of what the Company might have had to pay for some additional debt and preferred stock capital on or about the date certain. Such a procedure of computation introduces additional elements of judgment and speculation, the efficacy of which are questionable and it may well be contended that this inclusion extends the decision of the Ohio Supreme Court in *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio*, 171 Ohio St., 10 (1960), to an absurd extreme by excessively inflating, and thereby rendering of no specific import, the rate of return actually estimated and assigned to the statutory equity component of the rate base capitalization.

The City's rate of return witness did not specifically recommend a fair rate of return, but rather a method by which the fair rate of return might be determined once a determination is made of the statutory rate base. Since his testimony related to a proposed date certain of September 30, 1959, the capital structure he employed was 52% debt, 10.6% preferred stock and 37.4% common equity. Reduced to its simplest terms the method involves allowance of actual interest and preferred stock dividends plus an allowance of 9% on a hypothetical common equity. The hypothetical common equity would be the book equity adjusted upward by an average of the ratio of the rate base to the book capital and the ratio of property trended by the Consumer Price Index to the book investment. The witness's thesis seems to be that although debt and preferred stock holders cannot be protected from inflation since they can only receive the contract rates, the equity holders can and should be so protected. Further, he argues that they should be pro-

tected in proportion to the decline in the purchasing power of their dollars. Part of the earnings that accrue to the common equity holders are in the form of dividends received and part are retained by the Company and reinvested in the business. One measure of the decline in purchasing power of dollars reinvested in the business is the change in the prices of the equipment and property used by the utility in the rendition of service. Such a decline is reflected in the ratio of the rate base to the book capital or net investment in the business. In order to measure the decline in purchasing power of that portion of the earnings that are paid out in dividends, it would be necessary to know what these dollars are spent for and the changes in the prices of the goods and services purchased with such dividend income. The closest approximation to a measurement of such changes is, according to the witness, the Consumers Price Index published by the Bureau of Labor Statistics.

The rate of return that would be produced by the employment of the methods recommended by this witness in this proceeding would be in the order of 4 per cent. But if the pronouncements of the Ohio Supreme Court in aforecited *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio, supra,* are followed, then the method proposed by the City's witness would produce a rate of less than 5 per cent on the statutory equity.

In determining the fair rate of return in this case, the Commission is of the opinion that the average capital structure of the Appellant for the calendar year 1957 is reasonable. This capital structure consisted of 49.5% debt, 12.6% preferred stock and 37.9% equity. Employing the current rates being paid by the Company on its debt and preferred stock capital at the date certain and the rate on equity capital recommended by the Company's rate of return witness, the following results are obtained:

| Type of Capital | % of Total | Rates | Composite |
|---|---|---|---|
| Debt | 49.5% | 3.44% | 1.703% |
| Preferred Stock | 12.6 | 3.84 | .484 |
| Common Equity | 37.9 | 8.49 | 3.218 |
| Total | 100.0% | | 5.405% |

Upon consideration of this and of all other facts of record in this proceeding, the Commission is of the opinion that 5.4% represents a fair and reasonable rate of return upon the allocated statutory rate base valuation herein ascertained for the utility assumed to possess property of such valuation used and useful in the rendition of gas service to consumers within the City of Dayton.

When applied to the above-determined statutory rate base of $21,900,980 an allowable dollar annual return of $1,182,653 is produced for such a utility with this assumed property valuation, and "having a debt and an equity capital in a total amount substantially equal to the statutory rate base." *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio, supra.*

COST OF PURCHASED GAS

The Company's method of allocating the cost of purchased gas to the City of Dayton involves a summation of commodity and demand costs. The commodity cost is determined by multiplying the number of Mcf of gas sold with the City of Dayton by the Federal Power Commission determined wholesale commodity rate of 32.43c per Mcf. The demand cost is determined by multiplying the Federal Power Commission determined demand rate of $1.56 by pro-forma demand units. The total cost of gas determined by this method is $8,005,935 (Company Exhibit 4 [Revised], Schedule D). The Commission expressed its reasons for rejecting this method of determining the allocated cost of purchased gas in the "Greenfield" Case (Matter of the Application of the Dayton Power and Light Company, P. U. C. O. Case Number 27,149). The Commission's view was expressed therein that the proper method is on the basis of the average Company-wide cost of gas.

Where the Company buys all of its gas under unchanging Federal Power Commission demand and commodity rates, the average cost of gas will depend on the Company's annual load factor. Since this varies more or less from year to year, a three-year average rate, including the years 1956, 1957 and 1958, has been utilized herein by the Commission in determining the cost of gas. The average rate so determined amounts to $4586 per Mcf. This, multiplied by the Company's actual purchases during the test year of 16,928,090 Mcf, gives a total cost of purchased gas of $7,763,222 which the Commission finds

to be reasonable and proper for use in this proceeding.

RATE CASE EXPENSE

The total rate case expense allocable to the City of Dayton claimed by the Company in this proceeding is $350,000. The Company claims that this should be allocated over a two-year period. That is, it is proposed to include $175,000 as a part of annual expenses in the determination of rates.

The Commission is of the opinion that a more reasonable amortization period would be five years. The sum of $70,000 has been allowed, therefore, as annual expense in the determination of rates.

REVENUES, EXPENSES AND RETURN AT PRE-ORDINANCE RATES AND AT ORDINANCE RATES

The revenues, expenses and return "per books," at pre-ordinance rates, as shown in Company Exhibit 4 (Revised), may be summarized as follows:

| | |
|---|---:|
| Revenues | $11,233,454 |
| Operating Expenses | $ 9,416,432 |
| Taxes | 984,973 |
| Rate Case Expense | 68,828 |
| Depreciation | 237,142 |
| Total Expenses | $10,707,376 |
| Return | $ 526,079 |

The Ordinance rates have the effect of increasing the revenues by $235,481 and of increasing the return by $109,581 (Company Exhibit 4 [Revised], Schedule A). For purposes of testing the reasonableness of the Ordinance rates in this proceeding the Commission is of the opinion and so finds that the following expense adjustments are proper:

1) A reduction of $89,593 in Cost of Purchased Gas as explained above.

2) An increase in operating expenses of $60,079 primarily to reflect wage increases incurred during the test year, 1957.

3) A reduction of $68,829 in rate case expense to eliminate this item in testing the Ordinance rates.

4) An increase of $51,138 in Federal Income Taxes to reflect the above adjustments.

The adjusted figures at the Ordinance rates, before adjustment for hypothetical interest, may be summarized as follows:

| | |
|---|---|
| Revenues | $11,468,935 |
| Operating Expenses | $ 9,386,918 |
| Taxes | 1,162,012 |
| Depreciation | 237,142 |
| Total Expenses | $10,786,072 |
| Return | $ 682,863 |

This amounts to a rate of return on the rate base of 3.1%. After adjustment for hypothetical interest (Ohio Fuel Gas Company Case, *supra*), the dollar return becomes $793,591, or a rate of return of 3.6% on the rate base. The Commission is of the opinion that such rate of return is substantially below that necessary to fairly compensate this utility for the property used and useful in the rendition of gas service in the City of Dayton.

REVENUES, EXPENSES AND RETURN AT INCREASED RATES

The remaining determination is the additional amount of revenue necessary to produce the above determined allowable annual return of $1,182,653. Expenses must be further adjusted to include the $70,000 of allowable rate case expense and to reflect adjustments to taxes associated with this increased expense and with any increase in revenue. After these adjustments, the total expenses at the increased rates are $11,198,633 determined as follows:

| | |
|---|---|
| Operating Expenses | $ 9,386,918 |
| Taxes | 1,504,573 |
| Rate Case Expense | 70,000 |
| Depreciation | 237,142 |
| Total Expenses | $11,198,633 |

The allowable gross annual revenue is the sum of the expenses of $11,198,633 plus the dollar annual return of $1,182,653, or a total of $12,381,286. This requires an increase in revenues over those produced by the Ordinance rates of $912,351.

ULTIMATE FINDINGS

From the evidence, the Commission renders the following ultimate findings:

(1) That the Appeals of the Dayton Power and Light Company from Ordinance No. 19093 and Ordinance No. 19094 of the City of Dayton, Ohio, passed July 7, 1958, are duly filed pursuant to Section 4909.34, Revised Code, and that this Commission has jurisdiction thereof;

(2) That the date certain for purposes of these proceedings is June 30, 1957;

(3) That the statutory rate base valuation is $21,900, 980 as of the date certain, June 30, 1957;

(4) That at the Ordinance rates, the annual rate of return of 3.6 per cent is insufficient to yield reasonable compensation for the service rendered;

(5) That the fair annual rate of return for purposes of these proceedings is 5.4 per cent;

(6) That the allowable dollar annual return is $1,182,653;

(7) That the allowable expenses, including taxes and depreciation charges are $11,198,633; and

(8) That the allowable gross annual revenue is $12,381,286.

ORDER

It is, therefore,

ORDERED, That in accordance with the Opinion and Findings herein set forth, the Appellant, the Dayton Power and Light Company be, and the same hereby is, authorized to file with this Commission for its approval, adjusted tariff schedules increasing the rates and charges to gas consumers within the City of Dayton sufficiently to provide a total gross annual revenue from the sale of gas within the City of Dayton of $12,381,286. It is further

ORDERED, That such tariff schedules may become effective subsequent to approval by this Commission or upon such subsequent date as this Commission may designate.

THE PUBLIC UTILITIES COMMISSION OF OHIO

Entered in the Journal:     Edward J. Kenealy, Chairman
July 29, 1960              Everett H. Krueger, Jr.,
A true copy                          Commissioner
R. Martin Galvin, Secretary

*Concurring Opinion.* I concur generally in the ultimate findings reached and result obtained by the foregoing Findings and Order. This concurrence with respect to the rate of return, allowable dollar annual return, and allowable annual expenses is predicated, in part, upon the immediate need of this utility for rate relief as is manifested, in my opinion, upon the record herein. This follows, especially by reason of the substantial regulatory lag evidenced in these and antecedent rate proceedings.

It is to be noted in this connection that the actual rate of return to be realized under this Order by the Dayton Power and Light Company upon its property found to be used and useful in rendition of gas service to consumers within the City of Dayton is *4.90%* rather than *5.4%*, and that, accordingly, the dollar annual return allowed by said Order to this utility is approximately *$1,073,835.00* by virtue that the annual expenses, including taxes and annual depreciation accrual charges, which are allowed by this Order, in fact, aggregate about *$11,307,-451.00.* See *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio*, 171 Ohio St., 10 (1960).

Entered in the Journal:     Everett H. Krueger, Jr.,
July 29, 1960                        Commissioner
A true copy:
R. Martin Galvin, Secretary

*Dissenting Opinion.* I dissent from the majority opinion for reasons which will be set out hereafter in a separate opinion, believing the dollar annual return should be lower.

Entered in the Journal:     Frances McGovern,
July 29, 1960                        Commissioner
A true copy:
R. Martin Galvin, Secretary

*Concurring Opinion.* I concur generally in the ultimate findings reached and result obtained by the foregoing Findings and Order. This concurrence with respect to the rate of return,

allowable dollar annual return, and allowable annual expenses is predicated, in part, upon the immediate need of this utility for rate relief as is manifested, in my opinion, upon the record herein. This follows, especially by reason of the substantial regulatory lag evidenced in these and antecedent rate proceedings.

It is to be noted in this connection that the actual rate of return to be realized under this Order by the Dayton Power and Light Company upon its property found to be used and useful in rendition of gas service to consumers within the City of Dayton is *4.90%* rather than *5.4%*, and that, accordingly, the dollar annual return allowed by said Order to this utility is approximately *$1,073,835.00* by virtue that the annual expenses, including taxes and annual depreciation accrual charges, which are allowed by this Order, in fact, aggregate about *$11,307,-451.00*. See *Ohio Fuel Gas Co.* v. *Public Utilities Commission of Ohio*, 171 Ohio St., 10 (1960).

Entered in the Journal:  Everett H. Krueger, Jr.,
July 22, 1960  Commissioner
A true copy:
R. Martin Galvin, Secretary

*Dissent.* The rate base accepted by the majority is excessively high and not proved by the evidence.

I would urge dismissal of the appeals filed by the company for failure of proof were it not for the great investment of time and money made in the consideration and presentation of this case which would otherwise be futilely misspent, and were it not for the inference to be drawn, regardless of evidence, from experience in valuing gas company property under Ohio law that today's inflated costs, when applied to this property, for this date certain, would inevitably result in the establishment of a rate base not only in excess of the company's net investment in serviceable plant or even its gross book cost, but also in excess of 114% of its gross book cost—the latter being the dollar base on which the ordinance rates would have to be predicated at the rate of return allowed by this Commission.

### Depreciation

The property in two accounts, Mains and Services, con-

stitutes 71% of the total RCNLD value found by the Commission. Therefore any substantial error found in valuing these two accounts has a correspondingly great effect on the rate base and ultimately on the dollar return to the company.

Mains and Services are literally hidden assets. The condition of the mains and services can only be judged by uncovering all of them, which is quite impractical, or by uncovering samples, chosen at random, in the light of the best knowledge of what method of random selection will best exemplify the greater part of the system left buried in the ground.

The company exposed 672 lineal feet (1/8140) of its mains to view and only 135 lineal feet of services. There was no proof that this was a representative random sample that could be considered statistically acceptable. For this reason proof of the condition of these samples is not proof of the condition of the mains and services as a whole.

Of graver import in the valuation of the Mains and Services account is the method by which depreciation of sample pieces of pipe was calculated. The company averaged the ten deepest pits found on the pipe wall. If ten pits could not be found, the company averaged zeros with the fewer measurements. The ratio which that figure bears to the standard thickness of the pipe wall, rounded off to the nearest five-percent, was then regarded as "at least (a) ninety percent contribution to the final answer" (R-155) on depreciation.

The method and the heavy weighting assigned to it understates depreciation by failing to take into adequate account the condition of the coating and wrapping (and there are no pits to measure unless the coating and wrapping are damaged), the possible critical depth of a few pits, or the actual piercing of a pipe wall, the grouping of the pits, and the fact, later discovered, that 19% of the samples had a thinner standard pipe wall thickness than the standard pipe wall thickness used to arrive at the ratio expressed as depreciation. It also understates even more the depreciation of unwrapped steel pipe which is subject to more rapid deterioration, to the extent that depreciation of all pipe exposed is averaged and then assigned to unexposed unwrapped pipe.

Standing alone, this method of averaging pit depths, supplying zeros, rounding, and weighting, rejecting as it does

other physical evidence important to consider as criteria for judging depreciation, is recommended only by its simplicity and by the comforting assurance it holds out that in arithmetic there is truth.

In depreciating the services, the company found no obsolescence even though some considerable portion of the services consists of cast iron pipe which would not be used today.

The method of depreciating meters makes more work than sense. The company took the average RCN value of meters brought into the shop for repairs and averaged it with the RCN value less average cost of repairs. The result was deemed to be the RCNLD value which, when substracted from the RCN value, gave the dollar depreciation. The same result would in every instance follow from simply taking one-half the average repair bill as depreciation. One-half the repair bill does not suggest to me any dependable measure of depreciation.

Obsolescent meters were depreciated in a similarly curious manner. The RCN value was average with the salvage value to get the RCNLD value. Then RCN less RCNLD equaled the depreciation. Since this formula can bring only one result, i. e. depreciation for obsolescence equals fifty percent of the difference between RCN value and salvage value, arithmetic proves nothing and merely restates the assumption.

For these reasons, I cannot accept the company's estimates of depreciation of mains, 22.67%, services 21.39%, and meters 12.5%.

The Secretary's Report which contains the staff RCN values and depreciation accepted by the majority has no special standing in these proceedings. It was not prepared for these proceedings but for an earlier application case. It was not introduced into the record by the Commission but was instead received in evidence as Company Exhibit No. 45, and it was not supported adequately by the testimony of Boyd D. Tackett, Commission Engineer, who was called as a witness for the company. His testimony was necessarily limited to answers to the questions asked.

The staff viewed the same samples of mains and services that the company appraisers viewed, and no more, and no link was furnished to show that the condition of the samples

was indicative of the condition of all mains and services. For this reason, I reject the staff conclusions drawn from the evidence of the samples for the same reason that I rejected company conclusions.

With regard specifically to the condition of the samples viewed, I would be more inclined to rely on the experience and judgment of experts, Commission or otherwise, than on a formula of averaging pit depths which only partly takes into account what the experts saw, and I am convinced that if Mr. Tackett saw the samples and used his judgment of depreciation, it would likely be reliable. Unfortunately, Mr. Tackett did not see the property and the member of staff who did was not called to testify as to his own methods. This leaves without any support on the record the estimate of field depreciation on which the total depreciation of mains and services was principally based.

In other accounts involving property not viewed by Mr. Tackett or, presumably, anyone else on the staff, depreciation was based only on Mr. Tackett's general knowledge, but since he stated that not only did he not see the assets but also that he did not know, and did not want to know, the ages of respective assets, I am unable to accept general knowledge as the standard of judging depreciation.

I am also unable to accept the unsupported statement in the Secretary's Report that all depreciation of all plant and property of the company is attributable to mechanical deterioration and none of it attributable to obsolescence or lack of utility. There is clear controverting evidence that cast iron mains, services and many meters to mention three instances were very old and at least partially obsolete as well as deteriorated. There is also equally clear controverting evidence that some parts of parallel distribution systems, acquired from the Dayton Gas Company, built prior to 1910, still show up on the maps as being unretired but were found not to be in actual use.

The company arrived at an over-all average depreciation of 19.77%. The staff over-all depreciation, accepted by the majority, was 19.12%. Assuming assertions not proved were nonetheless true, and assuming the unlikely hypothesis that the errors cancelled themselves out, then either the staff or the company depreciation could be accepted despite misgivings. I

cannot assume this, however, because every other way I can think of for checking out the reasonableness of the assigned depreciation forces me to the conclusion that the depreciation is understated.

As earlier remarked, mains and services constitute 71% of the plant and property included in the rate base accepted by the majority. Mains and services were the principal assets acquired from the Dayton Gas Company in 1925. According to the testimony of the Commission staff Engineer, the booked values of the unretired mains acquired in 1925, trended to to-day's RCN value, account for about 50% of the total RCN value of all the mains. These mains were booked as 1925 values at only 70 to 75% of their appraised value. Not all of this difference of 25 to 30% was depreciation in 1925 (part representing an adjustment to reflect a lower purchase price) but most of it was. If we adopt the perfectly reasonable hypothesis that these mains built between 1907 and 1925 or even before, were 40% depreciated in 1957, 32 years later, the surviving mains installed since 1925 must not be depreciated *at all* if the average depreciation of mains is the 20.24% accepted by the majority.

The pre-1925 services and meters account for about 42% and 24%, respectively, of the services and meters included in the rate base by the majority. Again assuming these to be depreciated 40%, the services installed in the last 32 years before the 1957 date certain must be depreciated only 17% if the average depreciation is 26.7%, and the meters put into service in this same 32 year period must be depreciated only 3.8% if the average depreciation is 12.5%.

Even if the assumed 40% depreciation of assets acquired prior to 1925 is too high and is somewhat modified, the average over-all depreciation accepted by the majority is too low to allow for a reasonable average depreciation of property acquired since 1925.

I am left without any method by which to make a test check on whether the unproved depreciation is reasonable for the reasons that (1) details are not available to permit a recalculation of pit depths without averaging zeros, even assuming pit depths were compelling evidence and assuming the samples were proved to indicate the condition of the buried mains and

pipes, (2) a dependable depreciation reserve ratio of the plant and property allocable to the City of Dayton cannot be found on the record, (3) the average annual accrual rates are valueless because the average age of the various items of plant and property is not known.

The depreciation, accepted by the majority, is 19.12%, even less than that urged by the company. I would assign 25% depreciation instead and feel that to be quite low enough.

### Reproduction Cost New

The RCN values found by the Company of the accounts making up most of the property involved in these proceedings have been built up inference by inference upon the shaky foundation of maps, counts and samples. The fundamental sources of the inventory are maps which were taken from other maps which were in turn taken from other maps. Backing up these maps are field notes and in the words of one of the Company's engineers, "the farther back they went, the more fragmentary . . . ." (R. 142). Lengths of the pipe were estimated by scaling some of these old maps. Sizes of pipe and number of fittings were guessed at. It may well be, that the results of the scaling, the estimating and the guessing are accurate, but there is very little assurance from the evidence that this is so.

The trending of book values does not require particular specifications to be deduced from fragmentary evidence, unit by unit, and thus is not so likely to magnify errors. Therefore, in the circumstances of this case, I concur with the majority in preferring the trended RCN value found by the staff for P. U. C. O. Case No. 27,178 and introduced in these proceedings by the Company, to the priced out inventory of the Company's Engineering Consultants.

I cannot accept that trended valuation, however, without further modification for the reason that it may include trended costs of property not included by the Company as property serving Dayton. The Dayton system is part of a much larger system serving outlying areas. Negotiations and rate ordinances for these outlying areas are predicated on allocations of property likely to be derived from the Company's allocation of property to the City of Dayton. If more property is included for purposes of these proceedings than the Company itself has included, it is not only possible but highly probable

that the sum of the allocations to Dayton and the outlying communities will be more than 100% of the property of the entire system.

From the record of these proceedings it is impossible to establish with certainty whether the staff has trended the dollar values of the same property taken as a whole that the Company has priced out because the staff indentifies property to some extent by function (mains, cast iron mains, feeder system, etc.) while the Company describes the property by inches of diameter, length in feet, pressure, etc.

An indication of a disparity can be inferred, however, from comparing the capital and the gross book value of the company with the gross book value of assets found in the Secretary's Report. The beginning point is to be found in Company Exhibit No. 4A which includes the Company's calculation of income taxes. The deduction for actual interest is $157,968. The actual interest rate which the Company is obligated to pay to its creditors for its long-term debt is 3.44%. This presupposes a debt of approximately $4,592,093. Since the debt ratio is 49.5%, the total capital invested in plant and property within the City of Dayton as of the date certain can be estimated at $9,276,955. The Engineer's Table No. 6 of Company Exhibit No. 45, which is the Secretary's Report in Case No. 27,178, shows, however, a booked value of plant and property allocable to the City of Dayton of $13,717,339.

From this booked value, an adjustment of $662,264 must be subtracted since it had earlier been added to the book figures in order to reach an appraisal figure which could be trended from 1925 as the RCN value. The adjusted gross book of the Secretary's Report would then be $13,055,075.

The difference between capital and gross book is ordinarily the depreciation reserve. The difference between the Company's reconstructed capital and the staff's adjusted gross book value here is $3,778,120 which would suggest a depreciation reserve ratio of 28.94%, a ratio I think more reasonable than that assigned by the Company or the staff to the respective RCN values submitted in this case. But if instead one would wish to compare a gross book figure with a gross book figure, Company Exhibit 4A, Schedule I, p. 9, states that the Company's gross book value is $11,681,279.78. The differ-

ence between the Company gross book value as so calculated and staff gross book value then is $1,373,796.

If the same property has been valued by both the Company and the staff, then the difference in gross book value can be explained either as an understatement of gross book value by the Company or an overstatement of gross book value by the staff.

If, on the other hand, the gross book values assigned by the staff and by the company respectively, correctly represent the property each took into account, then the staff must indeed have trended up more property than the company priced out.

The company has the burden of proving its rate base. All valuation testimony, whether it came from a Commission staff member or from a witness employed by the company, was presented by the company. Faced with the dilemma of choosing the best explanation for this difference with nothing in the record to point the way, I would resolve the doubt in favor of the consumer by deciding that the staff valued more property by about $1,400,000 than the company. The difference represents almost 11% of the book value trended by the Commission staff.

My judgment is that the RCN value assigned by the staff, less 10%, approximates the trended value of the property allocated to the City of Dayton by the company.

### Summary

I repeat that my first inclination was to urge dismissal of the appeals for failure of proof. The practical considerations which led me to suggest a different rate base added nothing to the qualify or quantity of information available from this record. The modifications of the depreciation rate and reconstruction cost new which I propose merely reflect my best judgment of what the rate base should be from the slim evidence I could find in this record.

The trended RCN value of the staff less 10% equals $24,114,752. Depreciation of 25% equals $6,028,688. The RCNLD value then would be $18,086,064. The working capital, agreed to by the majority, adjusted to these changes would be $404,020, making the rate base $18,490,084. I concur in the rate of return of 5.4% allowed by the majority. The allowable dollar annual return under this rate of return is, then, $998,464

instead of the $1,182,653 allowed by the majority. Total revenues of $11,983,546 result in a net return to the company of $998,464:

| | |
|---|---:|
| Operating Expenses | $ 9,386,918 |
| Taxes | 1,291,022 |
| Rate Case Expense | 70,000 |
| Depreciation | 237,142 |
| Total Expenses | $10,985,082 |
| Plus Dollar Annual Return | 998,464 |
| Total Increased Revenue | $11,983,546 |

This represents an increase in revenue over that produced by the Ordinance rates of $514,611, or about 56% of the revenue increase of $912,351 allowed by the majority.

The 1956 case of *City of Cleveland, et al* v. *PUCO,* 164 Ohio St., 442, states that "neither the actual capital of or net investment in this public utility nor its actual earnings requirements are really material in a proceeding of this kind" (p. 444), so there is no need to inquire whether the return on the rate base suggested as fair and just in this dissent is fair and just by any other standard than that required by Ohio law. *However*, for the purpose of determining under the requirements of the Ohio Constitution that the return is not in fact confiscatory, I would point out that the suggested dollar return to the company would provide 9.6% annually on capital and 19.8% annually on the common stockholders' equity. Concluding easily that it is not confiscatory, I leave for others to judge whether this suggested return is attractive to investors.

Entered in Journal        Frances McGovern,
August 11, 1960                  Commissioner
A true copy:
R. Martin Galvin, Secretary